T.C. Summary Opinion 2012-83


UNITED STATES TAX COURT


RONALD WEBSTER MOORE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 28869-10S.                    Filed August 23, 2012.


Ronald Webster Moore, pro se.

<u>Mark J. Tober</u>, for respondent.


SUMMARY OPINION


GOEKE, <u>Judge</u>:  This case was heard pursuant to the provisions of section

7463[1] of the Internal Revenue Code in effect when the petition was filed.  Pursuant

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a $2,768[2] deficiency in petitioner's Federal income tax for 2008. The issue for decision is whether petitioner received a taxable deemed distribution in 2008 upon the expiration of his life insurance policy. For the reasons stated herein, we hold that petitioner did not receive a taxable deemed distribution in 2008 and therefore is not liable for the $2,768 deficiency.

## Background

Petitioner resided in Florida when he filed his petition. On September 28, 1975, while residing in Virginia, petitioner contracted with Nationwide Life Insurance Co. (Nationwide) to obtain whole life insurance. The face amount of the life insurance policy was $20,000; the policy required a monthly premium payment of $26 beginning September 28, 1975.[3] Petitioner elected the automatic premium loan provision, explained infra, in the contract.

---

[2]All amounts are rounded to the nearest dollar.

[3]Premium payments for whole life insurance are bifurcated so that part of each payment is attributed to the cost of insurance and part accumulates as cash value. The insurer invests the cash value, which continues to grow tax deferred as long as the policy is in force. The insured can borrow against the cash value, but unpaid policy loans and interest will be subtracted from the death benefit.

I.  The Life Insurance Contract

The pertinent provisions of petitioner's life insurance policy contract are as follows:

Premium Payment and Reinstatement

Payment of Premiums and Grace Period--Each premium after the first is payable on or before its due date * * *.  Any premium not paid on or before its due date will be in default.

A grace period of 31 days will be allowed for payment of each premium after the first, during which period the policy will continue in force. * * * If a premium remains unpaid at the end of the grace period the policy shall thereupon terminate and be without further value except as may be provided under the Nonforfeiture Provisions. [Emphasis added.]

Upon written request to the Company, the frequency of premium payment may, with respect to premiums not yet paid, be changed to annual, semi-annual, quarterly or monthly * * *.

Reinstatement--If a premium is in default beyond the grace period and if this policy has not been surrendered for its cash value, it may be reinstated within five years after the due date of the premium first in default upon receipt by the Company of (a) evidence of insurability of the insured satisfactory to the Company and (b) payment of all overdue premiums and payment or reinstatement of any indebtedness to the Company on this policy, together with payment of compound interest on such premiums and indebtedness at 5% per year.

Loan Provisions

Automatic Premium Loan--If this provision is elected * * * in the application * * * , then at any time after the policy has a net cash value

as defined in the Nonforfeiture Provisions a loan will be automatically granted to pay a premium in default.  If the resulting total indebtedness with interest to the end of the current policy year would exceed the cash value of the policy plus the cash value of any existing dividend additions or the amount of dividend accumulations on such date * * * then this provision shall not be effective and the Nonforfeiture Provisions shall apply.  Revocation of this provision shall be made by written notice filed at the Home Office.

NonForfeiture Provisions

Nonforfeiture Options--Within three months after the due date of any premium in default one of the nonforfeiture options may be elected. Such election shall be by proper written request to the Company.

*      *      *      *      *      *      *

If by the end of the 31 day grace period following the due date of any premium in default no option has been elected, an option will be determined automatically as follows, subject to the right to revoke such option by election of another available option at any time within the three month election period:

(1) [Extended Term Insurance][4] * * * will be effective automatically if this policy is in a Standard Premium Class;[5]

## II. Nationwide's Records

At respondent's request, Nationwide provided the following information relating to petitioner's life insurance policy: (1) a record of premium payments made by petitioner; (2) a record of automatic premium loans made by Nationwide; (3) several letters from Nationwide to petitioner sent between 2005 and 2010; and (4) Nationwide's calculation of petitioner's taxable gain arising from the termination of his life insurance policy.

---

[4]The extended term insurance option allows the policyholder "[t]o continue this policy as nonparticipating extended term insurance from the due date of the premium in default for an amount equal to the face amount, plus the face amount of any paid-up additions and the amount of any dividend accumulations and less any indebtedness to the Company on this policy."

The period of extended term insurance "shall be such as the net cash value will provide when applied as a net single premium at the attained age of the Insured on the date the premium is in default."

[5]Petitioner's policy was in a standard premium class.

A.  Nationwide's Record of Premium Payments

The following schedule reflects Nationwide's record of petitioner's premium

payments (premium record):

| Due Date | Received Date | Transaction Amount | Payment Frequency |
|----------|---------------|---------------------|-------------------|
| 9/28/75 | 10/20/75 | 26.22 | Monthly |
| 10/28/75 | 1/27/76 | 26.22 | Monthly |
| 11/28/75 | 2/12/76 | 26.22 | Monthly |
| 12/28/75 | 3/10/76 | 26.22 | Monthly |
| 1/28/76 | 3/10/76 | 26.22 | Monthly |
| 2/28/76 | 3/11/76 | 26.22 | Monthly |
| 3/28/76 | 4/6/76 | 26.22 | Monthly |
| 4/28/76 | 5/12/76 | 26.22 | Monthly |
| 5/28/76 | 6/9/76 | 26.22 | Monthly |
| 6/28/76 | 7/26/76 | 26.22 | Monthly |
| 7/28/76 | 8/16/76 | 26.22 | Monthly |
| 8/28/76 | 9/15/76 | 26.22 | Monthly |
| 9/28/76 | 10/20/76 | 26.22 | Monthly |
| 10/28/76 | 11/16/76 | 26.22 | Monthly |
| 11/28/76 | 12/14/76 | 26.22 | Monthly |
| 12/28/76 | 1/10/77 | 26.22 | Monthly |
| 1/28/77 | 2/14/77 | 26.22 | Monthly |
| 2/28/77 | 3/7/77 | 26.22 | Monthly |
| 3/28/77 | 6/17/77 | 77.65 | Quarterly |
| 6/28/77 | 6/17/77 | 77.65 | Quarterly |
| 9/28/77 | 10/11/77 | 301.30 | Annual |
| 9/28/78 | 9/20/78 | 301.30 | Annual |
| 9/28/79 | 9/28/79 | 301.30 | Annual |
| 9/28/80 | 1/9/81 | 301.30 | Annual - APL |
| 9/28/81 | 12/23/81 | 301.30 | Annual - APL |
| 9/28/82 | 12/27/82 | 301.30 | Annual - APL |
| 9/28/83 | 12/23/83 | 301.30 | Annual - APL |
| 9/28/84 | 12/27/84 | 301.30 | Annual - APL |
| 9/28/85 | 12/27/85 | 301.30 | Annual - APL |
| 9/28/86 | 12/24/86 | 301.30 | Annual - APL |
| 9/28/87 | 12/23/87 | 301.30 | Annual - APL |
| 9/28/88 | 12/27/88 | 301.30 | Annual - APL |
| 9/28/89 | 12/27/89 | 301.30 | Annual - APL |
| 9/28/90 | 12/27/90 | 301.30 | Annual - APL |
| 9/28/91 | 12/27/91 | 301.30 | Annual - APL |
| 9/28/92 | 12/23/92 | 301.30 | Annual - APL |
| 9/28/93 | 12/27/93 | 301.30 | Annual - APL |
| 9/28/94 | 12/23/94 | 301.30 | Annual - APL |
| 9/28/95 | 12/27/95 | 290.60 | Annual - APL |
| 9/28/96 | 12/23/96 | 290.60 | Annual - APL |

| Due Date | Received Date | Transaction Amount | Payment Frequency |
|----------|---------------|--------------------|-------------------|
| 9/28/97 | 12/27/97 | 290.60 | Annual - APL |
| 9/28/98 | 12/27/98 | 290.60 | Annual - APL |
| 9/28/99 | 12/23/99 | 290.60 | Annual - APL |
| 9/28/00 | 12/27/00 | 290.60 | Annual - APL |
| 9/28/01 | 12/23/01 | 290.60 | Annual - APL |
| 9/28/02 | 12/23/02 | 290.60 | Annual - APL |
| 9/28/03 | 12/27/03 | 290.60 | Annual - APL |
| 9/28/04 | 12/27/04 | 290.60 | Annual - APL |
| 9/28/05 | 12/23/05 | 290.60 | Annual - APL |
| 9/28/06 | 12/26/06 | 290.60 | Annual - APL |
| 9/28/07 | 12/23/07 | 290.60 | Annual - APL |

Petitioner stated that he made the first 18 monthly premium payments totaling $472 and then ceased making payments after February 28, 1977.[6] He did nothing to cancel the policy because he believed that the policy would eventually terminate according to the terms of the contract.

B. Nationwide's Record of Loan Payments

Nationwide's record of automatic loan payments (loan record) coincides with the information in the premium record[7]–Nationwide issued its first automatic premium loan to petitioner on January 9, 1981, and continued issuing automatic premium loans annually through 2007.

---

[6]Respondent alleged in his pretrial memorandum that petitioner stopped making payments after the September 28, 1979, payment. However, at trial respondent seemed to agree that petitioner ceased making payments after the February 28, 1977, payment.

[7]The "APL" reference in the premium record indicates that the payment was made through an automatic premium loan. The loan record shows automatic premium loan payments issued on the same dates as in the premium record.

C.  Correspondence Between Nationwide and Petitioner

As mentioned supra, petitioner resided in Virginia at the time he entered into the life insurance contract with Nationwide.  At that time, he was in the military. For the past 12 years, petitioner has lived at the same address in Florida.  He received mail from Nationwide at that address but generally believed that this mail was marketing materials.  Nationwide provided copies of letters sent to petitioner on the following dates at his Florida address:

1.  November 27, 2005--Nationwide sent petitioner a letter informing him that "[s]ince we have not received payment for your past due premium, and, there was sufficient cash value on your policy, the premium has been paid by the Automatic Premium Loan Provision."  The letter also stated that:  (1) the premium due date was September 28, 2005; (2) the loan amount used to pay the premium was $291;[8] and (3) the total loan on the policy was $18,722.[9]

2.  November 27, 2006--The following year Nationwide sent petitioner a letter informing him that because Nationwide had not received his past due

---

[8]The loan was not issued until December 23, 2005.

[9]Aside from petitioner's election of the automatic premium loan provision in the 1975 life insurance contract, the November 27, 2005, letter is the earliest record supporting that petitioner received notice that the automatic premium loan provision was being implemented to pay the outstanding premium on his policy.

premium on his life insurance policy "the automatic premium loan provision has jumped in to help". The letter stated that the loan amount used to pay the premium was $291[10] and the total loan on the policy was $20,154.

3. <u>December 8, 2006</u>--This letter informed petitioner that his current surrender value in the policy was $856. Moreover, the letter stated that Nationwide was aware of petitioner's request to terminate his policy and enclosed a pamphlet to help him decide whether that decision was really best for him.[11] Finally, the letter stated that petitioner would have to complete a "surrender application" to officially terminate the policy.[12]

4. <u>November 27, 2007</u>--The next year Nationwide sent another letter to petitioner informing him that once again "the automatic premium loan provision has jumped in to help". The letter stated that the loan amount used to pay the premium was $291[13] and the total loan on the policy was $21,671.

---

[10]The loan was not issued until December 28, 2006.

[11]On the contrary, as noted <u>supra</u>, petitioner testified that he did not attempt to cancel his policy. It is unclear from the record whether petitioner requested to terminate the policy in 2006.

[12]There is no evidence in the record indicating that petitioner completed the surrender application.

[13]The loan was not issued until December 23, 2007.

5. <u>November 30, 2008</u>--One year later, Nationwide sent petitioner a letter informing him that he was in default and therefore the policy had been converted to extended term insurance effective September 28, 2008.[14] Moreover, the letter stated that because the policy had been converted, the automatic premium loans were now permanent withdrawals resulting in taxable income of $17,941 for the 2008 tax year.

6. <u>August 5, 2009</u>--This letter informed petitioner of the requirements to reinstate his policy: (1) complete and return the reinstatement application; and (2) upon approval of the reinstatement application, make a premium payment of $581 and a loan payment of $1,255.

7. <u>February 21, 2010</u>--This letter informed petitioner that his extended term insurance had expired without value.

D. <u>Nationwide's Calculation of Petitioner's 2008 Constructive Distribution</u>

Nationwide sent a letter to respondent dated March 14, 2012, explaining how Nationwide had determined petitioner's 2008 taxable distribution. The letter explained that petitioner's premiums were due on the "anniversary of the policy" and that when premiums were not paid, the automatic premium loan provision was

---

[14]At that time the cash available in the policy was $253, which was used to purchase extended term insurance that would expire March 23, 2010.

used to pay the premiums. The letter went on to explain that the automatic premium loan provision continued to pay the premium until the policy value could no longer continue supporting additional loan amounts, which occurred in 2008.[15] Finally, the letter provided the following calculation of petitioner's taxable gain:

| Cash Value | Amount |
|---|---|
| Loan paid off at time policy was placed on extended insurance effective 9/28/2008 | $21,671 |
| Investment in the policy | |
| Premiums paid on base policy | 9,293 |
| (-) Dividends earned (does not include interest) | 5,563 |
| (=) Investment in policy | 3,730 |
| Taxable gain (cash value - investment in policy) | 17,941 |

Nationwide supported its calculation with the premium record and the loan record, discussed supra. However, the sum of the premiums in the premium record does not reconcile with the "premiums paid" amount in the calculation.[16] Moreover, there is no supporting documentation for the "dividends earned". Finally, Nationwide has

---

[15]It is unclear from the record how the automatic premium loans affected the policy value and how the policy value continued to support the issuance of the automatic premium loans for approximately 30 years when petitioner made premium payments totaling only $472.

[16]The sum of premium payments in the premium record is $9,828.

not provided any documentation indicating that the policy value supported the issuance of any automatic premium loans.

## III. Notice of Deficiency

Nationwide issued to petitioner a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for the 2008 tax year, reporting a taxable distribution of $17,941. On his 2008 Federal income tax return petitioner reported no income with respect to the policy's termination. In a notice of deficiency respondent determined that petitioner had improperly omitted from taxable income the $17,941 reported on the Form 1099-R. Petitioner timely filed a petition with this Court contesting the notice of deficiency.

## Discussion

## I. Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.[17] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, section 7491(a)(1) and (2) shifts the burden of proof to

---

[17]While we recognize that sec. 6201(d) may shift the burden of production to respondent, because respondent has met this burden, we do not address the issue further.

the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if (1) the taxpayer introduces credible evidence with respect to such issue, and (2) the taxpayer satisfies certain other conditions, including cooperation with the Government's requests for witnesses, information, and documents. See also Rule 142(a)(2). The burden is on the taxpayer to show that he satisfied these prerequisites. See Richardson v. Commissioner, T.C. Memo. 2005-143; H.R. Conf. Rept. No. 105-599, at 240, 242 (1998), 1998-3 C.B. 747, 993.

The factual issue in this case is whether the life insurance policy expired during the 2008 tax year. Petitioner argues that the policy expired around the time when he ceased making premium payments, by the very terms in the contract. He introduced the life insurance policy contract and credibly testified as to his understanding of how the reinstatement, automatic premium loan, and nonforfeiture provisions interacted. Furthermore, petitioner has cooperated with the Internal Revenue Service. We find that petitioner has produced credible evidence that the policy should have terminated before the 2008 tax year, and thus the burden of proof shifts to respondent.

## II. The Constructive Distribution

Section 61(a) defines gross income as "all income from whatever source derived" unless otherwise provided. Section 72(e)(1)(A) and (5)(A) and (C)

provides that an amount received under a life insurance contract that is not received as an annuity is included in gross income to the extent it exceeds the investment in the contract. The term "investment in the contract" is defined under section 72(e)(6) as "(A) the aggregate amount of premiums or other consideration paid for the contract before such date, minus (B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income".

For Federal income tax purposes, loans against a life insurance contract's cash value are treated as true loans from the insurance company to the policyholder with the policy serving as collateral. See Minnis v. Commissioner, 71 T.C. 1049, 1054 (1979); Sanders v. Commissioner, T.C. Memo. 2010-279; Atwood v. Commissioner, T.C. Memo. 1999-61. Thus, using the policy's proceeds to satisfy the loans has the same effect as paying the proceeds directly to the policyholder. See e.g., Atwood v. Commissioner, T.C. Memo. 1999-61. In V.R. Deangelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, aff'd, 574 F.3d 789 (2d Cir. 2009), we explained the significance of automatic premium loan provisions--

> [Automatic premium loan] provisions allow an insurance company to
> pay a premium due on a policy by way of a loan taken out against the
> cash value of the policy. The loan is subject to interest charges and
> affects the policy's cash value only as a potential reduction of that
> value. The total amount of outstanding loans on the policy is usually

less than the policy's cash value because the policy will generally lapse when the total amount of the loans exceeds the cash value.

Respondent argues that the policy contract remained valid for 30 years after petitioner's final payment because the automatic premium loan provision required Nationwide to lend petitioner a premium payment if he was in default on the policy contract and the only way to revoke the provision was by written notice filed with the "Home Office". Because petitioner did not file written notice revoking the automatic premium loan provision, respondent asserts that the policy remained in effect until 2008 when the policy value no longer supported another automatic premium loan. Respondent concludes that petitioner received a taxable distribution from Nationwide in 2008 when the policy contract terminated--Nationwide was deemed to make a distribution to petitioner, and petitioner was deemed to use the distribution to repay Nationwide the automatic premium loan balance.

Petitioner argues that the automatic premium loan provision did not prevent his policy contract from terminating after he ceased making payments. He believes that the nonforfeiture provisions operated to convert the policy to term insurance when he ceased making payments unless he took affirmative steps to reinstate the original policy. On the basis of his interpretation of the life insurance policy

contract, petitioner stopped making premium payments in 1977 and considered the policy abandoned.

The policy contract provides: (1) premium payments not paid on or before their due date "will be in default"; (2) after default, the policy will remain in effect for a 31-day grace period; and (3) the policy will terminate if premiums are unpaid by the end of the grace period. Furthermore, the policy contract goes on to explain that: (1) the policy may be reinstated within five years after the due date of the premium payment first in default upon Nationwide's receipt of certain evidence from petitioner; (2) an automatic premium loan will automatically be granted to pay a premium in default when the policy has a net cash value; and (3) the policy will automatically be placed on extended term insurance if no payment is made by the end of the 31-day grace period.

Several of the premium payments were made after the expiration of the grace period--the payments were not made in time to prevent the insurance policy from terminating. Premium payments due October 28, November 28, and December 28, 1975, January 28, 1976, and March 28, 1977, were not made within the grace period, and Nationwide did not issue automatic premium loans to prevent the policy

from terminating.[18]  Accordingly, the policy should have terminated and been converted to extended term insurance following the expiration of the grace period for any of the aforementioned due dates.

Moreover, all premium payments due beginning September 28, 1980 through 2007, were not made within the grace period.  Automatic premium loans were issued to pay the premiums three months after their respective due dates.  The automatic premium loan provision functions to pay premiums in default.  If a premium was not paid by the end of the grace period, the policy terminated.  After termination the policy had to be reinstated by certain affirmative actions by petitioner--the automatic premium loan provision could not reinstate the policy after it had terminated.

The policy contract provided that the frequency of premium payments could be altered only by a written request to Nationwide; however, there is no evidence in the record that such request was made.  Accordingly, by the very terms of the contract, the policy should have terminated at the expiration of the grace period for any of the aforementioned premium payment due dates.  Respondent has failed to

---

[18]It is unclear why Nationwide did not issue automatic premium loans to pay these premiums.

explain why the policy continued to remain in effect when by the very terms of the contract it should have terminated on several occasions.

We are not persuaded that petitioner's life insurance policy terminated in 2008 resulting in a taxable deemed distribution. Respondent's argument would have us construct a multitude of inferences in his favor and simultaneously turn a blind eye to several unexplained discrepancies in the record. This we will not do. We believe a plain reading of the terms in the life insurance contract signifies that the policy should have terminated and been converted to extended term insurance on several occasions before 2008.

III. Conclusion

For the reasons stated herein, we find that petitioner is not liable for the deficiency in income tax for the 2008 tax year.

To reflect the foregoing,

Decision will be entered

for petitioner.